UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

MELISSA EDER,

                Plaintiff,            06 Civ. 13013

    -against-                   OPINION

THE CITY OF NEW YORK, et al.,

                Defendants.

------------------------------------X

A P P E A R A N C E S:

         Attorneys for Plaintiff

         LAW OFFICE OF JOSEPH CARBONARO
         275 Madison Avenue, Suite 1605
         New York, NY  10016
         By:  Joseph Carbonaro, Esq.

         Attorneys for Defendants

         MICHAEL A. CARDOZO
         Corporation Counsel of the City of New York
         100 Church Street, Room 2-140
         New York, NY  10007
         By:  Carolyn Walker-Diallo, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-12-09

**Sweet, D.J.**

Defendants, the City of New York (the "City"),
the East New York Family Academy ("ENYFA"), and the New
York City Department of Education ("DOE") (collectively,
the "Defendants"), have moved pursuant to Rule 56, Fed. R.
Civ. P., for summary judgment to dismiss the complaint of
the plaintiff, Melissa Eder ("Eder" or the "Plaintiff")
alleging violation of the First Amendment and
discrimination and retaliation under Title VII of the Civil
Rights Act of 1964, as amended, as well as violation of the
State and City Human Rights laws.

Upon the facts and conclusions set forth below,
Defendants' motion is granted and the complaint dismissed.

**Prior Proceedings**

Eder, who is Jewish, filed her complaint on
November 8, 2006, alleging violation by Defendants of the
First Amendment, arising out of Christian activity at
ENYFA, and of Title VII and City and State human rights
laws, arising out of discrimination on the basis of

1

religion, a hostile work environment, and retaliation while being employed as a probationary art teacher at ENYFA.

Discovery proceeded and the instant motion was heard and marked fully submitted on June 30, 2008.

**The Facts**

The facts were set forth in Defendants' Local Rule 56.1 Statement and the Statement Pursuant to Local Rule 56.1 of the Plaintiff. The latter statement did not deny any of the facts set forth by the Defendants but set forth the events and statements as perceived by Eder.[1] Although the conclusions flowing from the facts are disputed, the material facts are not in dispute except as noted below.

_____

[1] Local Civil Rule 56.1(a) requires a motion for summary judgment to be accompanied by a statement, in numbered paragraphs, of material facts as to which the moving party contends there is no genuine issue to be tried. Local Civil Rule 56.1(b) requires that "[t]he papers opposing a motion for summary judgment . . . include *a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party* . . . ." (emphasis in original). Because Eder failed to respond to Defendants' Rule 56.1 Statement as required by Local Civil Rule 56.1(b), each properly supported fact set forth in Defendants' Statement may be deemed admitted for the purposes of this motion. See, e.g., Morriseau v. DLA Piper, 532 F. Supp. 2d 595, 618 (S.D.N.Y. 2008).

Eder received a master's degree in fine arts from Hunter College in 1990, and in 1998, was licensed to be an art teacher in the State of New York.

In 2000, Eder applied for an art teacher position at ENYFA and was interviewed by Alisha Cross, Assistant Principal ("Cross"), and then by Sheila Richards ("Richards"), Principal at ENYFA. Eder's art background, as well as her background in writing, impressed Richards who made the decision to hire Plaintiff to serve as an art teacher at ENYFA.

ENYFA is a New York City Public Middle and High School located in the East New York section of Brooklyn. Many of the students at ENYFA, especially those who transfer to ENYFA in High School, read below grade level and/or receive special education services.

On October 7, 2002, Plaintiff began working as a probationary art teacher at ENYFA. Her immediate supervisor was Robert Hornik, Assistant Principal ("Hornik"), who is Jewish.

3

Upon being hired, Eder was not informed about the tenure process or about the probation period. Prior to commencing work at ENYFA, she was not given any orientation program, was given no written materials to review, and did not meet with the administration. Eder, was, however, "thrilled" to get an art teacher's job. Pl. Ex. A, Eder Dep., at 38.

According to Eder, throughout the 2002-2003 school year, prayer circles were held in the principal's office approximately ten minutes before staff meetings. According to Eder, the prayers were Christian. Eder was invited to join the prayer circle but declined to do so. She also observed people praying before staff meetings.

Eder was not formally evaluated during the 2002-2003 school year. Richards informed Plaintiff that she was doing a good job, and Eder received a satisfactory rating at the end of the 2002-2003 school year.

According to Eder, during the 2003-2004 school year, Richards led a prayer in the hallway before the first staff development meeting on the opening day of school. Everyone except Eder left the auditorium and participated

4

in the prayer, joining hands while doing so. Eder heard
the prayer including words that "Jesus . . . give them
guidance throughout the school year." Id. at 63.

Eder claims that during the 2003-2004 school
year, she informed Hornik of the prayers and stated her
belief that the prayers were illegal and unconstitutional.
When asked by other faculty members why she did not
participate in one prayer circle, Eder responded that "it
is illegal to pray in school. It is unconstitutional."
Id. at 64.

According to Eder, religion would come up as
conversation in the teachers' lounge and occasionally there
would be evangelical preaching on the television.

A member of the secretarial staff played
religious-oriented music during school hours in the
photocopying room in the area located next to the teachers'
lounge.

At a staff development meeting in the fall of
2003, at which Hornik and Richards were present, there was
a discussion concerning the scientific revolution and it

5

was suggested that students discuss why Gandhi, Martin Luther King, and Adolph Hitler were revolutionary thinkers. Eder objected to the inclusion of Hitler in this project. No one supported her position and one teacher stated that "we need the students to decide for themselves." Id. at 64. According to Eder, both Cross and Richards smirked when Eder raised objections about the inclusion of Hitler in the project.

According to Eder, during the 2003-2004 school year, written prayers were placed into her mailbox on an almost daily basis.

On or about December 9, 2003, Hornik formally observed Eder teaching an art class. Eder received a satisfactory rating, and Hornik suggested, among other things, that Eder include a reflective writing piece "so students have a written record of their accomplishments, concerns and questions regarding their arts experience throughout the school year." Def. Ex. C, Dec. 9, 2003 Formal Observation Report, at 6.

In 1996, the New York State Education Department revised the art curriculum "Learning Standards for the

6

Arts," which required schools to incorporate literacy,
including writing, into the visual arts curriculum. Def.
Exhibit P, Learning Standards for the Arts, at 20-21. This
curriculum was in effect until the DOE adopted the
"Blueprint for Teaching Literacy and Learning in the Arts"
("Blueprint") curriculum in 2004. The Blueprint also
required schools to incorporate literacy in visual arts and
focused on ensuring that students were able to analyze and
respond to art. Eder attended various courses sponsored by
the DOE which discussed and taught the "Blueprint for the
Arts" program.

In April 2004, Eder made an appointment to meet
with Richards concerning an end of year art show. Cross
was also present. Richards stated, unprompted by anything
Plaintiff said, "I know you hate this school and I will be
happy to sign your transfer papers. You are like a poison
in this school." Plaintiff responded, "I don't understand.
You know, I really enjoy what I am doing here." Richards
then stated, "Well, it's not the job that you do." Eder
Dep. at 78.

At an award ceremony at the end of the 2003-2004
school year, Cross or Richards stated, "I know we are

7

supposed to have a separation of church and State, but I'm
giving this award to Mr. Vanderpool for being a spiritual
advisor for guiding myself and the school during a
difficult year." Id. at 84.

The previous art teacher at ENYFA left a
Christian medallion in the class locker, and Eder was
informed by a student that there was also a Christian medal
on the wall in the art classroom, posted by the prior
teacher.

Eder was given a certificate of appreciation for
conducting the end of year student art show.

While Eder was grading English Regents exams
during this period, Christian-oriented music was being
played in the school.

The 2004-2005 academic school year was
Plaintiff's third year at ENYFA requiring Hornik and
Richards to decide whether Eder would be recommended for
tenure.

8

On October 26, 2004, after evaluating Eder, Hornik noted that although she included a reflective writing piece, it was not a part of her normal class routine, as the writing piece had only been introduced on that day, and that she did not use other literacy components, including vocabulary or word walls, in her art class.

Despite her evaluations, Eder was assigned to teach Ninth grade English in the 2004-2005 school year.

In the fall of 2004, Plaintiff was informed by a teacher about a student play referring to retribution payments received by Jews after the Holocaust.

Before the school holiday party in the fall of 2004, while Richards was present, a teacher led the faculty in a Christian prayer which was done in Jesus' name.

On or about December 21, 2004, Hornik formally observed Eder and again noted that she did not incorporate literacy in her visual arts class.

9

By late December 2004, Plaintiff had been observed three times and informed that she had failed to properly incorporate literacy in her visual arts class, as required by the Blueprint. According to Eder, she incorporated the suggestions, but Hornik considered her efforts inadequate.

By letter dated January 31, 2005, Richards informed Eder that she had been absent from work a total of eight times from September to December 2004, that "[p]oor attendance and/or punctuality places a hardship on [her] colleagues and [the] school's instructional programs," and that "[c]ontinued lateness and/or absence can result in a letter to [plaintiff's] file and a "U" unsatisfactory rating." DOE Chancellor Regulation C-601 provides that absences may result in an adverse rating or the institution of proceedings for dismissal or termination of service. Def. Ex. F, Jan. 31, 2005 Letter.

On or about March 29, 2005, after a formal evaluation, Eder received an unsatisfactory rating and by letter dated March 29, 2005, Richards once again counseled her concerning her absences.

10

On May 3, 2005, Hornik formally observed
Plaintiff and noted that "it still remains evident that
your students have not been producing reflecting writing
pieces and you need to model this reflective writing piece
by providing students with sample." Def. Ex. I, May 2,
2005 Formal Observation Report. He also noted that since
Eder had provided a handout for a writing reflective
evaluation to the students, it represented a "positive
starting point" and gave her a satisfactory rating for that
classroom observation.

On May 31, 2005, Hornik formally observed Eder
again and gave her an unsatisfactory rating noting her
failure to adequately incorporate literacy in her art
class, that she had not posted any vocabulary, that
students did not have the ability to articulate what they
were doing in art, and that Eder had "done little to
incorporate literacy activities to enhance [her] art
program." Def. Ex. J.

According to Eder, Hornik's negative evaluations
were not warranted. According to Eder, during the 2003-
2004 school year, she maintained some art classes for the
fall semester but many fewer in the spring, and reflective

11

writing pieces were a formalized part of her art courses. She claims that she incorporated vocabulary into her art class and students read short biographies of artists prior to commencement of a project where they attempted to replicate the work of a great artist. She made a substantial effort to display the students' artwork in the hallways and in her classroom.

By letter dated June 20, 2005, Richards counseled Eder concerning her absences and noted that she had been late a total of 512 minutes since the beginning of the 2004-2005 academic school year.

When entering the teacher's lounge in the spring semester of 2005, Eder discovered a card bearing the photo of a Lubavitcher rabbi placed on the chair where she sat each day.

During the 2004-2005 school year, prior to an English Regents examination, the students were led in a prayer. Eder commented that it was illegal to pray in school, was upset, and left the room.

12

In June 2005, at the commencement exercise held
at Medgar Evers College, Ms. Cross and Mr. Hornik were
present during a speech stating that ENYFA rested on
hallowed ground and was a holy place.

A prayer entitled "Father's Love Letter" was
displayed on the door to the faculty lounge for the school
year 2004-2005.

On May 27, 2005, shortly before she was denied
tenure, Eder was given an award for her work setting up a
student art show and for being a good teacher.

At the end of the 2004-2005 school year, Eder was
offered an extension of her probationary term by one year
with the focus on obtaining tenure by September 1, 2006, in
exchange for her waiver of certain rights as an employee.
Eder refused to accept the extension of probation.

Pursuant to Section 2573 Subdivision 1 of the New
York State Education Law, Local Instructional
Superintendent Anthony Concelli denied Plaintiff's
certificate of completion of probation, and Eder was
terminated effective August 31, 2005.

13

## Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to

14

support its case is so slight, there is no genuine issue of
material fact and a grant of summary judgment is proper."
Gallo v. Prudential Resid. Servs., L.P., 22 F.3d 1219,
1223-24 (2d Cir. 1994) (citations omitted).

In determining whether a genuine issue of
material fact exists, a court must resolve all ambiguities
and draw all reasonable inferences against the moving
party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v.
Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the non-
moving party may not rely simply on conclusory allegations
or speculation to avoid summary judgment, but instead must
offer evidence to show that its version of the events is
not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109
(2d Cir. 1999) (quotation omitted).

## No First Amendment Violation Has Been Established

The First Amendment, applied to the states by the
Fourteenth Amendment, mandates that "Congress shall make no
law respecting an establishment of religion, or prohibiting
the free exercise thereof . . . ." U.S. Const. amend. I;
see Santa Fe Indep. Sch. Dist. V. Doe, 530 U.S. 290, 301

15

(2000) ("The Fourteenth Amendment imposes those substantive limitations on the legislative power of the States and their political subdivisions." (citing Wallace v. Jaffree, 472 U.S. 38, 49-50 (1985))). To survive a challenge under the Establishment Clause, a "government action that interacts with religion (1) 'must have a secular . . . purpose,' (2) must have a 'principal or primary effect . . . that neither advances nor inhibits religion,' and (3) 'must not foster an excessive government entanglement with religion.'" Skoros v. City of New York, 437 F.3d 1, 17 (2d Cir. 2006) (quoting Lemon v. Kurtzman, 403 U.S. 602, 612—13 (1971)).

Courts are instructed "to focus on the question of whether the challenged action can reasonably be viewed as a governmental endorsement of religion." Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469, 475 (2d Cir. 1999). In so doing, courts must recognize that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Bd. of Educ. of Westside Cmty. Sch. (Dist. 66) v. Mergens, 496 U.S. 226, 250 (1990) (emphasis in original).

16

"Nowhere has the proper line of demarcation been more difficult to define than in our nation's public schools." Roberts v. Madigan, 921 F.2d 1047, 1053 (10th Cir. 1990). While the Establishment Clause does not "impose a prohibition on all religious activity in [the] public schools," Santa Fe Indep. Sch. Dist., 530 U.S. at 313, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." Lee v. Weisman, 505 U.S. 577, 592 (1992). Accordingly, "schools have a constitutional duty to make 'certain . . . that subsidized teachers do not inculcate religion.'" Marchi, 173 F.3d at 475 (citation omitted).

Eder has contended that Defendants violated the First Amendment when: (1) Richards, other administrators and teachers participated in private prayer groups in the principal's office during non-school hours outside the presence of students; (2) the faculty participated in an opening school prayer before the beginning of the academic school year; (3) certain faculty members prayed over food that was served at a faculty holiday party in December 2004; (4) when the Regents Exam was delayed, a member of

the faculty led the students in prayer. Two of the other

incidents alleged by Eder, the mailings of the prayers and

the rabbi's photograph left on her chair, have not been

sufficiently attributed to Defendants and therefore are not

considered. The comments characterizing Adolph Hitler as a

"revolutionary thinker" at a professional development

session at ENYFA do not clearly implicate religion, and

will instead be considered below in connection with Eder's

Title VII claims.

Eder's First Amendment claim requires the Court

to determine whether these incidents constitute "public"

speech, which can be reasonably be viewed as a governmental

endorsement of religion, or protected "private" speech.

Several courts have attempted to balance a public school

teacher's right to express his or her own religious beliefs

with the school district's interest in avoiding the

perception that the teacher's religious statements or

activity bears the "imprimatur of the school" in violation

of the Establishment Clause. Roberts v. Madigan, 921 F.2d

1047, 1057 (10th Cir. 1990), cert. denied, 505 U.S. 1218

(1992) (holding that directive to teacher to refrain from

silently reading Bible in front of class was justified by

district's motive to prevent teacher from violating

Establishment Clause and did not violate teacher's First
Amendment rights); see Marchi, 173 F.3d at 475 (rejecting
teacher's argument that school district's directive to
refrain from using religion in curriculum violated
teacher's First Amendment rights); Doe v. Duncanville
Indep. Sch. Dist., 70 F.3d 402, 406 n.4 (5th Cir. 1995)
(noting that school employees violate Establishment Clause
by participating in student-lead prayer circle or otherwise
manifesting "approval and solidarity with student religious
exercises"); Peloza v. Capistrano Unified Sch. Dist., 37
F.3d 517 (9th Cir. 1994) (finding that school district's
interest in avoiding violation of Establishment Clause
justified prohibiting teacher from discussing religion with
students before and after class); May v. Evansville-
Vanderburgh Sch. Corp., 787 F.2d 1105 (7th Cir. 1986)
(denying teacher's claim to First Amendment right to hold
pre-school prayer meetings on school property); but see
Wigg v. Sioux Falls Sch. Dist. 49-5, 382 F.3d 807 (8th Cir.
2004) (holding that school district's prohibition on
teacher attending after-hours prayer meeting on school
grounds violated First Amendment).

The First Amendment simultaneously provides both
the limits of a school district's ability to proscribe a

teacher's religious expression on school grounds and the
school's ability to permit such religious expression.
While courts have recognized a school district's interest
in restricting or prohibiting a teacher from communicating
with students about their religious beliefs, it does not
follow that the Establishment Clause prevents school
employees from engaging in religious speech that poses no
threat of being interpreted as an endorsement of religion.
In this case, Eder has presented no evidence that the
conduct of ENYFA administrators or employees posed such a
threat.

Here, there is no indication that the private
prayer groups, prayer before the start of the 2003-2004
academic school year, or prayer that occurred over food
served at a faculty holiday party constituted public
speech. Given that no students, parents or members of the
public participated in these activities, these
communications could not have been perceived as bearing
"the imprimatur of the school."[2] Similarly there is no

---

[2] Eder has also alleged that one faculty member lead a group of students
in prayer prior to the Regents Exam. However, given that a "'plaintiff
generally must assert his own legal rights and interests, and cannot
rest his claim to relief on the legal rights or interests of third
parties,'" Valley Forge Christian Coll. v. Am. United for Separation of
Church & State, Inc., 454 U.S. 464, 474 (1982) (citation omitted), Eder
lacks standing to assert an Establishment Clause violation on behalf of

20

evidence that Eder was compelled to participate in the
private prayer groups or was barred from expressing her own
religious beliefs in violation of other provisions of the
First Amendment.

Eder has cited May, 787 F.2d 1105, to support her
claim that her First Amendment rights were violated. In
May, a school teacher sued the local district alleging that
her constitutional rights were violated because the
district did not allow her to pray on school property.
Based on the district's blanket policy prohibiting such
activity, the court held that plaintiff did not have a
constitutional right to pray on school premises. Here,
Eder has not presented any evidence that the DOE has any
such policy prohibiting any type of religious activity on
school grounds before or after the start or end of the
school day. Further, the holding in May does not purport
to make any determination on whether such religious
activity, if allowed, would violate the Establishment
Clause.

---

ENYFA students. See Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49,
70 (2d Cir. 2001) ("The rare exceptions to this rule generally involve
situations in which the plaintiff has a close relation with the third
party and 'there exists some hindrance to the third party's ability to
protect his or her own interests.'" (citing Edmonson v. Leesville
Concrete Co., 500 U.S. 614, 629 (1991))).

Because Eder has not demonstrated that the
religious activity described could reasonably be viewed as
endorsed by the state in violation of the Establishment
Clause, her First Amendment claims are dismissed.

## **Eder Has Not Established Religious Discrimination**

To establish a prima facie claim of
discrimination, a plaintiff has the initial burden of
directing the Court to evidence in the record demonstrating
that she: (1) is a member of a protected class; (2) was
performing her job satisfactorily; (3) suffered an adverse
employment action; and (4) the adverse employment action
took place under circumstances that give rise to an
inference of discrimination.[3]  See McDonnell Douglas Corp.
v. Green, 411 U.S. 792, 802 (1973); see also Meiri v.
Dacon, 759 F.2d 989, 994 (2d Cir. 1985) (applying the
McDonnell Douglas framework to religious discrimination
claims). Only if the plaintiff meets this initial burden
does the burden shift to the defendant to produce evidence
that the adverse employment action was taken for some

---

[3] Eder has also asserted claims under New York State and City law.
Because "identical standards apply to employment discrimination claims
brought under Title VII, Title IX, New York Executive Law § 296, and
the Administrative Code of the City of New York," the following Title
VII analysis also applies to Plaintiff's state and local claims.
Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000).

legitimate, non-discriminatory reason. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981); McDonnell Douglas Corp., 411 U.S. at 802. If the defendant articulates a legitimate non-discriminatory reason for the action, "the presumption raised by the prima facie case is rebutted, and drops from the case." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 255 n.10). The plaintiff then has the ultimate burden to demonstrate by a preponderance of the evidence that the articulated reason offered by Defendants was merely a pretext for actual discrimination. Burdine, 450 U.S. at 256; Mandell v. County of Suffolk, 316 F.3d 368, 380 (2d Cir. 2003).

This same framework is used in cases involving the denial of tenure and termination. In order to make a prima facie case for discrimination in the tenure context, a plaintiff must demonstrate that she was qualified for tenure and that the denial of tenure occurred under circumstances permitting an inference of discrimination. See Louis v. Bd. of Educ., 705 F. Supp. 751, 756 (E.D.N.Y.) (citing Zahorik v. Cornell Univ., 729 F.2d 85, 92 (2d Cir. 1984).

23

Eder has failed to establish a prima facie case of discrimination. In Zahorik, the Second Circuit held that a plaintiff will be deemed "qualified for tenure" where "some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." 729 F.2d at 94. The DOE requires that literacy be incorporated across all disciplines, including art education, and has in place curriculums which require that students be able to respond to and analyze art in written form. During the 2003-2004 and 2004-2005 school years, Hornik informed Eder on several occasions that she failed to properly incorporate literacy into her class. Based on these observations, neither Hornik, Eder's immediate supervisor, nor Richards, believed Eder was ready for tenure.

Although Eder has challenged the appropriateness of Hornik's determinations, there is no evidence to create an inference that either his negative evaluation or the decision to extend Eder's probationary period was based on religious discrimination. Eder and Hornik, Eder's immediate supervisor who assessed Plaintiff's performance and determined that it was lacking, are members of the same protected class. Thus, any inference of discrimination,

24

without additional evidence, is not warranted. Marlow v. Office of Court Admin., 820 F. Supp. 753, 757 (S.D.N.Y. 1993), aff'd, 22 F.3d 1091 (2d Cir. 1994) (relying in part on inference against discrimination where person who participated in the allegedly adverse decision is also a member of the same protected class); Toliver v. Cmty. Action Comm'n, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir. 1986) (finding that where decision maker is in the same protected class as plaintiff, claims of discrimination become less plausible).

To further support an inference of discrimination, Eder points to statements made by Richards, in the presence of Cross, during an April 2004 meeting, calling Eder a "poison," and stating that the problems she was having at the school, "[w]ell, it's not the job that you do," and repeating the phrase several times. Eder Dep. 77-78. Despite Eder's claims, these statements, on their face, do not refer to Eder's religion and, without more, cannot be construed as anti-Semitic. Even assuming that they were intended as such, standing alone, these statements are stray and ambiguous with no nexus to the denial of Plaintiff's tenure, which occurred over a year later. See Danzer v. Norden Sys., Inc., 151 F.3d 50, 56

(2d Cir. 1998) (noting that stray remarks by a decision-maker, with no nexus to the adverse employment action, do not, without more, establish discrimination).

Finally, the record is devoid of any evidence relating to the tenure of other similarly-situated teachers at ENYFA. See Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (noting that a showing of disparate treatment is "a recognized method of raising an inference of discrimination for the purposes of making a prima case" of religious discrimination). Eder has not produced any evidence that she was treated differently from her non-Jewish co-workers in terms of her tenure. To the extent that Defendants removed Eder's art classes from her schedule during the 2004-2005 academic school year, there is no evidence that Plaintiff's non-Jewish colleagues' schedules were also not changed or that such acts affected the terms and conditions of her employment.

In view of Hornik's evaluations and Eder's attendance record there is no basis to infer that Richards' extension of probation was religious discrimination. But even if Eder had established a prima facie case of discrimination, Defendants have articulated a non-

26

discriminatory reason for extending her probationary
period, and so the burden again falls to Plaintiff to point
to evidence indicating that these justifications are mere
pretext. "When the same actor hires a person already
within the protected class, and then later fires that same
person, 'it is difficult to impute to her an invidious
motivation that would be inconsistent with the decision to
hire.'" Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137
(2d Cir. 2000) (quoting Grady v. Affiliated Cent., Inc.,
130 F.3d 553, 560 (2d Cir. 1997)). The fact that Richards
participated in both hiring and extending Eder's probation,
"strongly suggests that invidious discrimination was
unlikely." Grady, 130 F.3d at 560.

Because Eder has not established that she was
qualified for tenure or made the required showing that the
decision to deny her tenure was the result of religious
discrimination, the claim is dismissed.

## The Hostile Environment Claim Has Not Been Established

Under Title VII, an actionable hostile work
environment claim exists only where there the evidence
demonstrates that "'the workplace is permeated with

27

discriminatory intimidation, ridicule, and insult that is
sufficiently severe or pervasive to alter the conditions of
the victim's employment.'" Cruz v. Coach Stores, Inc., 202
F.3d 560, 570 (2d Cir.2000) (quoting Harris v. Forklift
Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations
omitted). "This test has objective and subjective
elements: the misconduct shown must be 'severe or pervasive
enough to create an objectively hostile or abusive work
environment,' and the victim must also subjectively
perceive the environment to be abusive." Alfano v.
Costello, 294 F.3d 365, 374 (2d Cir.2002) (citing Harris,
510 U.S. at 21). In order to be deemed pervasive,
"incidents must be more than episodic; they must be
sufficiently continuous and concerted." Alfano, 294 F.3d
at 374 (quotation and citation omitted). In addition,
there must be evidence that "a specific basis exists for
imputing the conduct that created the hostile work
environment to the employer." Perry v. Ethan Allen, Inc.,
115 F.3d 143, 149 (2d Cir.1997).


        Here, Eder has contended that her hostile work
environment resulted from the following incidents:   (1) the
principal allegedly called her a "poison" in the spring of
2004; (2) an unidentified individual left a picture of a

                                28

rabbi on a chair presumed to be hers in the Spring of 2005;
(3) a co-worker distributed inspirational poems or prayers
to all teachers in the school; (4) co-workers referred to
Adolph Hitler as a "revolutionary thinker" at a
professional development training in 2004; and (5) the
existence of private prayer groups and religious activity
at ENYFA during non-school hours.

Even assuming that these incidents manifested
some discriminatory animus, the incidents are too few and
far between to constitute the sort of pervasive comments
that create a hostile work environment. See Demoret v.
Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006) (denying
plaintiff's hostile work environment claim on grounds that
plaintiff failed to establish that alleged incidents were
"so severe as to be abusive"); Perez v. Comm'cns Workers of
Am., 210 F.App'x 27, 31 (2d Cir. 2006) (upholding district
court's holding that "isolated examples" of "ethnic or
religious animus or insensitivity on the part of various
coworkers" were "insufficiently severe or pervasive to
constitute a material change in [plaintiff's] employment");
Williams v. County of Westchester, 171 F.3d 98, 100-101 (2d
Cir. 1999) (holding that plaintiff's testimony that his

work atmosphere was "not good" was insufficient to
demonstrate hostile work environment based on race).

Although Eder felt that she was an "outsider" at
ENYFA, the evidence does that show that to the degree she
was treated as such, it was because she is Jewish.    The
Circuit has warned that there must be an affirmative
linkage between alleged hostile conduct and the plaintiff's
protected characteristic.    In Alfano, the Circuit held
that:

> Everyone can be characterized by sex, race,
> ethnicity or (real or perceived) disability; and
> many bosses are harsh, unjust, and rude.    It is
> therefore important in hostile work environment
> cases to exclude from consideration personnel
> decisions that lack a linkage or correlation to
> the claimed ground of discrimination.    Otherwise,
> the federal courts will become a court of
> personnel appeals.

Alfano v. Costello, 294 F.3d at 377.

To support her claim of a hostile work
environment, Plaintiff relies on Abramson v. William
Patterson Coll. of N.J., 260 F.3d 265 (3d Cir. 2001).    In
Abramson, Plaintiff, an Orthodox Jewish professor, alleged
that she was terminated because her supervisors were
motivated by discriminatory animus stemming from her
insistence that she be allowed to observe her religious

holy days. In reviewing the District Court's grant of summary judgment, the Third Circuit concluded that "the many incidents recounted by [plaintiff], coupled with the declarations of other [] professors, are relevant and probative . . . of the prima facie case for hostile work environment claims." Id. at 279. Here, Eder has not presented "many incidents" of religious animus nor has she presented any declarations of other teachers at ENYFA to support her claim that she was subjected to a hostile work environment.

The conduct to which Eder cites is not sufficiently severe or pervasive to support the complaint, and therefore her hostile work environment claim is dismissed.

**Retaliation Has Not Been Established**

In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) the defendant was aware of the protected activity; (3) an adverse employment action followed; and (4) a causal connection between the protected activity and the adverse employment action existed.

Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 (2d Cir. 2006) (citation omitted). Once plaintiff has established a prima facie case, the burden again shifts to the defendant "to articulate a legitimate, non-retaliatory reason" for her termination. Giannone v. Deutsche Bank Sec., Inc., 392 F. Supp. 2d 576, 592 (S.D.N.Y. 2005); Young v. Rogers & Wells LLP, No. 00 Civ. 8019 (GEL), 2002 WL 31496205, at *6 (S.D.N.Y. 2002). If the defendant proffers a sufficient reason, then "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

Eder alleges that in 2003 she complained to Hornik about the prayers that were taking place at ENYFA, and that as a result of these complaints, her probationary employment was terminated and she was unable to achieve tenure. However, Plaintiff has failed to present sufficient evidence to establish a causal connection between these two events. There is no evidence to establish that Richards' and Hornik's decision to offer Plaintiff an extension of her probationary period was in any way connected to her informing Hornik that she did not

feel comfortable with the private prayer that occurred in
the school. Eder's testimony reflects that she does not
know if Richards influenced Hornik to give her
unsatisfactory ratings. Further, given the time passed
between the alleged complaint in the Fall 2003, and ENYFA's
decision not to offer her tenure in June 2005, the
circumstances do not present "a situation where the
exercise of Title VII rights was 'closely followed' by an
adverse employment action." Zenni v. Hard Rock Cafe Int'l,
903 F. Supp. 644, 656 (S.D.N.Y. 1995).

Eder also asserts that her silent refusal to
participate in religious activity at the school constitutes
protected activity. However, Eder has not demonstrated a
causal connection between her refusal to participate, her
receiving unsatisfactory ratings and the decision to extend
her probation.

Finally, even if Plaintiff could establish a
prima facie case of retaliation, Defendants have proffered
a legitimate, non-retaliatory justification for offering
Eder an extended probationary period, namely her
evaluations and attendance record. Eder has introduced no

evidence to suggest that these reasons are false and that the allegedly false reasons are being used as pretext.

Given the evidence in the record in this case, and viewing the facts in the light most favorable to Plaintiff, Plaintiff has not met her burden in establishing her retaliation claim. Accordingly, Plaintiff's retaliation claim is dismissed.

**Conclusion**

Upon the facts and conclusions set forth above, the motion of the Defendants for summary judgment dismissing the complaint is granted.

Submit judgment on notice.

It is so ordered.

**New York, N.Y.**
**February** *//* , 2009

ROBERT W. SWEET
U.S.D.J.